# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 0:16-cr-00319-ADM-KMM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| (1) Jesus Alberto Barron-Celis, <br> (4) Elvia Adilene Ibarra-Sanchez, | |
| Defendants. | |

Thomas M. Hollenhorst, Assistant U.S. Attorney, counsel for the government

Kurt B. Glaser, Smith & Glaser, LLC, counsel for Mr. Barron-Celis

Robert M. Paule, Robert M. Paule, PA, counsel for Ms. Ibarra-Sanchez

Jesus Alberto Barron-Celis and Elvia Adilene Ibarra-Sanchez move to suppress the fruits of allegedly unlawful searches and seizures.[1] ECF Nos. 49, 74. Mr. Barron-Celis moves to suppress evidence obtained from the search of a vehicle, as well as

---

[1] On February 16, 2017, both defendants submitted post-hearing briefing on their motions. Mem. in Supp. of Def. Barron-Celis Mot. for Suppression of Evid. ("Barron-Celis Mem."), ECF No. 114; Def.'s Mem. of Law in Supp. of Mot. to Suppress ("Ibarra-Sanchez Mem."), at 1, ECF No. 115. The government responded on February 24, 2017, Gov't's Mem. in Opp'n to Defense Mots. to Suppress ("Gov't's Mem."), ECF No. 116, and Mr. Barron-Celis filed a reply memorandum on March 6, 2017, Mem. of Def. Barron-Celis Replying to Gov't' Mem. Opposing Suppression of Evidence ("Barron-Celis Reply"), ECF No. 120.

evidence seized pursuant to a search warrant of a home on Victoria Street.[2] The challenge to the search of the vehicle is based on testimony provided at the January 20, 2017 motions hearing, *see* Barron-Celis Mem. at 1-10, and the challenge to the warrant requires a "four-corners" analysis of the warrant application and supporting affidavit; *id.* at 11. Ms. Ibarra-Sanchez moves to suppress evidence obtained pursuant to a different search warrant—one that covers an apartment on Woodbridge Street[3]—in a four-corners challenge. Ibarra-Sanchez Mem. at 1. For the reasons set forth below, the Court concludes that Mr. Barron-Celis' motion, ECF No. 74, should be granted in part and denied in part, and Ms. Ibarra-Sanchez's motion, ECF No. 49, should be denied.

## I. Mr. Barron-Celis's Motion

### A. Facts

In the fall of 2016, Timothy Fletcher, an officer with the Dakota County Sheriff's Office, was involved in an investigation of methamphetamine distribution in St. Paul. Tr. of Jan. 20, 2017 Hr'g ("Tr.") 21:17-22:10. In October 2016, law enforcement officers conducted two controlled buys of methamphetamine. These transactions involved two of Mr. Barron-Celis's co-defendants, Jeovani Leonardo Huerta-Gonzalez and Ms. Ibarra-Sanchez. Tr. 22:12-17. For each transaction, an undercover agent contacted Mr. Huerta-Gonzalez by telephone and arranged to buy methamphetamine from him. Tr. 22:18-23:3. At least one previous transaction had taken place at Mr. Huerta-Gonzalez's home, but the October transactions occurred elsewhere. *See* Tr. 23:4-16.

During the October 20th and 27th deals, Ms. Ibarra-Sanchez waited nearby, leading Officer Fletcher to conclude that she was acting as a lookout to warn others if law enforcement appeared. Tr. 24:8-25:1. In each case, the undercover agent arranging the drug buys gave Mr. Huerta-Gonzalez one day's notice, but Mr. Huerta-Gonzlez

---

[2] The application, supporting affidavit, and resulting search warrant were marked and admitted at the motions hearing as Government Exhibit 2. *See* Ex. List, ECF No. 87.

[3] The application, supporting affidavit, and resulting search warrant were marked and admitted at the motions hearing as Government Exhibit 1. *See* Ex. List.

indicated that he could get significant quantities of methamphetamine whenever the undercover agent needed it. Tr. 25:2-22. This suggested to Officer Fletcher that Mr. Huerta-Gonzalez "had access to a source of supply that was within Minnesota." Tr. 25:23-26:1.

Around the time of the October 2016 controlled buys, law enforcement placed GPS tracking devices on two of Mr. Huerta-Gonzalez's vehicles. During the investigation, GPS data indicated that Mr. Huerta-Gonzalez traveled from his residence on Woodbridge Street to the intersection of Victoria Street and Idaho Avenue several times. Tr. 27:11-28:3. Officers noticed a pattern in Mr. Huerta-Gonzalez's movements; he would travel to the intersection of Victoria and Idaho, stop for a short period of time, and then go to a public place like a shopping mall for another short period of time. Tr. 28:4-9.

On November 1st, the undercover agent arranged with Mr. Huerta-Gonzalez to pay $8,000 owed for methamphetamine previously taken on credit, and to purchase an additional five pounds. Tr. 26:2-27:6. Around noon that day, Officer Fletcher received a briefing from other law enforcement personnel about a plan for the transaction. The undercover agent had arranged to meet Mr. Huerta-Gonzalez at a Minneapolis bakery to purchase the five pounds of methamphetamine, but law enforcement planned to stop Mr. Huerta-Gonzalez in his vehicle on his way to meet with the undercover agent. Tr. 29:1-20.

That day, officers were surveilling Mr. Huerta-Gonzalez's home on Woodbridge Street in St. Paul. Tr. 29:22-30:5. About half an hour after the undercover agent contacted Mr. Huerta-Gonzalez to set up the meeting, officers saw Mr. Huerta-Gonzalez and Ms. Ibarra-Sanchez leave the Woodbridge residence in separate vehicles. *See* Tr. 49:6-10. The pair stopped near the intersection of Victoria and Idaho, as Mr. Huerta-Gonzalez had done in the past. This intersection was a short distance away from a residence at 1629 Victoria Street, and Officer Fletcher saw Mr. Huerta-Gonzalez exit his vehicle and enter the residence. Tr. 30:6-31:11. Ms. Ibarra-Sanchez remained in her vehicle, and Officer Fletcher again believed she was acting as a lookout. Tr. 31:12-32:8. After about five or ten minutes inside the Victoria Street residence, Mr. Huerta-Gonzalez came back outside carrying a white shopping bag, which officers had not seen him carrying earlier in the day or when he entered the home. Tr. 32:9-16. Officer Fletcher concluded that Mr. Huerta-Gonzalez was using the Victoria Street residence as a "stash house" where he could pick up

3

drugs prior to a sale. This conclusion was based on observations on November 1st and on the GPS data gathered earlier in the investigation, which showed several stops near the home. Tr. 32:17-33:23. Mr. Huerta-Gonzalez returned to his vehicle with the white shopping bag and drove away. About thirty minutes later, Officer Fletcher learned that other officers stopped both Mr. Huerta-Gonzalez and Ms. Ibarra-Sanchez shortly thereafter, searched the contents of their vehicles, and found five pounds of methamphetamine inside the white shopping bag in Mr. Huerta-Gonzalez's car. Tr. 34:6-17.

Officers decided to apply for a search warrant for the Victoria Street residence. Gov't's Ex. 2. The affidavit supporting the search warrant application explained that task force agents had made controlled buys from Mr. Huerta-Gonzalez, followed him from the Woodbridge residence to the home on Victoria Street, watched him go inside the home on Victoria Street and emerge later with a white shopping bag. After stopping his vehicle when he left the location, a drug dog alerted to the presence of narcotics, and officers found approximately five pounds of methamphetamine in the white shopping bag. Based on these facts, a Ramsey County District Court judge issued the warrant authorizing the search of the Victoria Street residence. *See id.*

The search warrant was executed around 5:15 p.m. on November 1, 2016. *See id.* at 6 (warrant return listing time premises were searched). While other officers were applying for the search warrant, Officer Fletcher continued surveillance at the Victoria Street residence. Tr. 34:18-24. Between ninety minutes and two hours after the arrest of Mr. Huerta-Gonzalez and Ms. Ibarra-Sanchez, officers saw two men—later identified as Mr. Barron-Celis and Victor Manuel Cruz—leave the home, each carrying a backpack. They both got into a dark Jeep Grand Cherokee, with Mr. Barron-Celis getting into the driver's seat. Tr. 35:4-19.

Officer Fletcher testified that he was concerned that Mr. Huerta-Gonzalez had somehow called and warned these individuals that there was trouble before he and Ms. Ibarra-Sanchez were stopped and arrested, and these men were attempting to remove drugs from the home. Tr. 35:20-36:2. Neither Officer Fletcher, nor anyone else in the investigation, had any indication that a call had actually been made, "but from prior experience, [Officer Fletcher knew] that that's not uncommon to happen." Tr. 36:3-6; *id.* at 42:7-10. Officer Fletcher had not observed Mr. Barron-Celis or Mr. Cruz during the controlled buys that took place prior to November 1st, and had not seen them before. Tr. 41:18-42:2.

4

Shortly after Mr. Barron-Celis and Mr. Cruz drove away from the Victoria Street residence, officers conducting surveillance at the home asked the Roseville Police Department to stop the vehicle.[4] Tr. 36:22-37:11. The surveilling officers followed the Jeep for approximately four miles, until a marked Roseville squad car pulled in and activated its lights. However, the Jeep did not stop right away and continued for up to another half mile until the Roseville squad car activated its siren.[5] Tr. 37:17-38:2.

Mr. Barron-Celis, who was driving, eventually pulled the Jeep into a parking lot at a Radisson hotel. Tr. 37:17-38:2. Guests at the hotel came outside to watch as Officer Fletcher and other unmarked cruisers with activated lights joined the Roseville squad car that initiated the stop. Tr. 38:3-13. The officers drew their guns and pointed them at the vehicle because they were conducting a "felony stop." Tr. 38:10-17. Officers ordered the occupants of the Jeep out of the vehicle, handcuffed them, and placed them in the back of police cars on the scene. Tr. 38:18-21. Officer Fletcher looked in both backpacks in the car, finding nine pounds of methamphetamine in the backpack that had been in the backseat behind Mr. Barron-Celis. Tr. 38:22-39:6. Officers also found $5,900 in cash in the center console of the Jeep, several cell phones, some papers, compact discs, and other items. Tr. 39:8-16.

### B. Analysis

#### 1. The Victoria Street Search Warrant

Mr. Barron-Celis asserts a four-corners challenge to the warrant authorizing a search of the Victoria Street home. After carefully reviewing the warrant application and supporting affidavit, the Court concludes that the warrant was based on probable cause.

"Probable cause exists where there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Skoda*, 705 F.3d 834, 838 (8th Cir. 2013) (quotation marks omitted) (citing *United States v. Donnelly*, 475

---

[4] The officers conducting surveillance were in unmarked vehicles and wanted a marked unit to make the stop to keep the occupants of the Jeep from becoming overly suspicious and attempting to flee. Tr. 37:5-11.

[5] The officers did not observe a traffic violation prior to the stop. Tr. 42:25-43:3.

F.3d 946, 954 (8th Cir. 2007) and *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). When determining whether probable cause exists, a court does not independently evaluate each piece of information, but, rather, considers "all of the facts for their cumulative meaning." *United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002). "A showing of probable cause requires evidence of a nexus between the contraband and the place to be searched." *United States v. Skarda*, 845 F.3d 370 (8th Cir. 2016) (quotation marks omitted) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). The task of a court issuing a search warrant is "simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also United States v. Seidel*, 677 F.3d 334, 337 (8th Cir. 2012). The issuing court's "determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (quotation marks omitted) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a substantial basis for . . . [concluding] that probable cause existed." *Id.* at 238-39.

The facts relevant to this challenge are found in the search warrant application and supporting affidavit introduced into evidence as Government's Exhibit 2 at the hearing. The application sought to search a single-family residence located at 1629 Victoria Street in St. Paul. The affidavit supporting the application informed the issuing court that task force agents had done prior controlled buys with Mr. Huerta-Gonzalez in September and October 2016. On November 1st, officers saw him leave his Woodbridge Street residence and travel to the Victoria Street home. There they saw him exit his vehicle, enter the residence, and come out a short time later carrying a small white paper shopping bag he did not have when he entered the house. When they later stopped him, they found the white paper shopping bag in the vehicle and the crystal substance inside the bag tested positive for methamphetamine. Based on this information, the affiant stated that he believed the Victoria Street residence was being used as an outlet for drug trafficking. The issuing court agreed and signed the warrant.

The search warrant application at issue provided the issuing court with a substantial basis to conclude that probable cause existed for a search of the residence. The affidavit connected Mr. Huerta-Gonzalez to drug trafficking activity via controlled buys and connected that drug trafficking activity to the Victoria Street

6

home by virtue of observing him pick up five pounds of methamphetamine there. Cumulatively these facts provide a fair probability that contraband or other evidence of drug trafficking would be found in the home. Accordingly, there is no basis on the four corners of the warrant to conclude that the issuing court lacked a sufficient showing of probable cause. Mr. Barron-Celis's motion should be denied to the extent it challenges the validity of the Victoria Street search warrant.

### 2. The Search of the Jeep

Mr. Barron-Celis argues that evidence found in the Jeep must be suppressed because it violated his Fourth Amendment rights. *See* Mem. in Supp. of Def. Barron-Celis' Mot. for Suppression of Evidence ("Def. Barron-Celis' Mem."), ECF No. 114. The government offers two rationales to uphold the warrantless search of the Jeep. First, the government argues that the search was valid under the automobile exception to the warrant requirement, Gov't's Mem. at 5-6, and second, that officers had probable cause to arrest Mr. Barron-Celis, thereby justifying their search of the vehicle as incident to his arrest, *id.* at 7-8. The government relies on the same facts to justify both asserted justifications for Mr. Barron-Celis's warrantless arrest and the warrantless search of the Jeep. *Compare* Gov't's Mem. at 5-6, *with id.* at 7-8.[6]

"'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting *Katz v. United States*, 389 U.S. 347,

---

[6] Through their briefing, the parties have limited the issues for the Court's review. Though the Court heard testimony relevant to the towing and inventory of the Jeep, the government has affirmatively waived any reliance on the inventory exception to support its position. Gov't's Mem. at 5 ("Nor does the government rely upon the inventory exception to the Fourth Amendment."). Similarly, the government has advanced no argument that the stop of the Jeep was justified by police observation of a traffic violation followed by some other justification for the search of the vehicle's passenger compartment. *See* Gov't's Mem. at 5 ("The government does not rely on *Whren v. United States*, 517 U.S. 806 (1996)."). Because the government has not made any argument concerning these issues, the Court will not address them in this report and recommendation. *See United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003) ("If the government wishes to rely on an exception [to the warrant requirement], it bears the burden of demonstrating that the exception exists.").

7

357 (1967)). Whether in the context of the automobile exception or a search incident to arrest, probable cause is always judged by the totality of the circumstances. *See United States v. Mayo*, 627 F.3d 709, 713 (8th Cir. 2010) (citing *United States v. Faldten*, 210 F.3d 1083, 1085 (8th Cir. 2000)).

Under the automobile exception, officers may conduct a warrantless search of an automobile if they have probable cause to believe the vehicle contains contraband or evidence of criminal activity. *United States v. Ross*, 456 U.S. 798, 806-09 (1982); *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016). "Probable cause exists where there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Shackelford*, 830 F.3d at 753 (internal quotation marks omitted). The probable cause inquiry in the context of the automobile exception focuses on what law enforcement officers knew "at the time of the search" of the vehicle. *United States v. Kennedy*, 427 F.3d 1136, 1140-41 (8th Cir. 2005).

In contrast, the search incident to a lawful arrest "turns on whether there was probable cause for [the defendant's] arrest."[7] *United States v. Chartier*, 772 F.3d 539, 545 (8th Cir. 2014). Probable cause to arrest exists where the facts known at the time of arrest "'warrant a person of reasonable caution to believe that an offense was being committed by the person to be arrested.'" *United States v. Houston*, 548 F.3d 1151, 1154 (8th Cir. 2008) (quoting *United States v. Adams*, 346 F.3d 1165, 1169 (8th Cir. 2003)). In this case, the government must establish either that there was probable cause that Mr. Barron-Celis had committed a crime, or the car contained, narcotics or evidence of drug trafficking. Because the government relies on the same facts to support its position under either exception the analysis converges.

The government asserts that Mr. Barron-Celis and Mr. Cruz's "conduct [of leaving the house with backpacks following Mr. Huerta-Gonzalez's arrest] was highly suspicious" when taking into account the full context of the information the officers

---

[7] The parties have not addressed that the search-incident-to-arrest exception is not applicable unless "the arrestee is within reaching distance of the passenger compartment or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 351 (2009). The Court need not reach this question because it finds that there was not probable cause to support the warrantless arrest of Mr. Barron-Celis, making the proximity of the backpack irrelevant.

8

had acquired. Gov't's Mem. at 6. The government argues that "the police were justified in concluding that Barron and Cruz were Huerta's drug suppliers and that their bags and the vehicle contained contraband or other evidence of their drug trafficking activities." *Id.* The government further contends that "it would be reasonable for a police officer to assume under these circumstances that the backpacks contained additional drugs or that they contained the proceeds of sale of the five-pound drug transaction (which involved $40,000 worth of drugs)." *Id.* at 8.

The Court is mindful that "[i]n the case of a warrantless search, the government bears the burden of establishing an exception to the warrant requirement," *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005), which requires production of evidence "at the suppression hearing" showing that its "conduct fell within the bounds of the exception," *id.* at 1144. Evaluating whether the government carried its burden here, the Court notes that in its written arguments the government relies on cases that discuss the general legal principles behind the two exceptions the government invokes, but points to no decisions that explore facts similar to those at issue here. *See* Gov't's Mem. at 6-8 (citing *Arizona v. Gant*, 556 U.S. 332 (2009) (search incident to arrest); *United States v. Watson*, 423 U.S. 411) (1976) (warrantless arrest on probable cause of a felony permissible); *Chambers v. Maroney*, 399 U.S. 42, 48-52 (1970) (automobile exception); and *United States v. Shackleford*, 830 F.3d 751 (8th Cir. 2016) (automobile exception)).

The record here demonstrates that the officers knew nothing specific about the two men they saw leaving the Victoria Street property on November 1st, but had a hunch that they were responsible for selling methamphetamine to Mr. Huerta-Gonzalez and were carrying evidence of criminal activity in their backpacks. But a hunch is not enough to establish probable cause. *See United States v. Hogan*, 25 F.3d 690, 693 (8th Cir. 1994) ("At most, the agents had a hunch that the drugs from the house or the truck might be in the Oldsmobile. . . . The prerequisite to a valid search under the automobile exception . . . is probable cause, not a hunch."). Here, the government invites the Court to assume that someone who was in a home when a suspect picked up drugs and then left ninety minutes or more after the suspect had gone must have been involved in the illegal activity. The government offers no support for such a broad rule, and the Court has found none.

Indeed, simply because the police had sufficient information that evidence of drug-trafficking activity would likely be found in the Victoria Street home[8] does not mean that there was probable cause to believe that anyone leaving the home was engaged in criminal activity or carrying evidence of a crime. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."); *United States v. Everroad*, 704 F.2d 403, 406-07 (8th Cir. 1983) ("[M]ere association with a known or suspected criminal, or mere presence in that person's automobile, does not create probable cause to arrest . . . Nor is probable cause established by the presence of a person in a location known to be frequently involved in narcotics sales or other crimes."); *see also United States v. Young*, 184 F.3d 781, 783 (8th Cir. 1999) ("[M]ere proximity to someone for whom probable cause exists does not provide probable cause as to another person . . . ."); *United States v. Knox*, 888 F.2d 585, 587 (8th Cir. 1989) (observing that mere physical proximity, even when combined with a brief association with a suspected criminal, does not amount to probable cause); *cf. United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2012) ("A mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves that property.").

The Eighth Circuit's decision in *United States v. Everroad* is particularly instructive. 704 F.2d 404-06. In *Everroad*, the Eighth Circuit distilled the evidence before it to "two basic facts" known to the officers who decided to arrest the

---

[8] During his testimony, Officer Fletcher referred to the Victoria Street residence as a "stash house," but did not define the term or explain in any detail why his experience led him to that conclusion. The evidence from the hearing suggests the Victoria Street residence was likely where Mr. Huerta-Gonzalez resupplied himself with drugs for distribution. However, the record contains no evidence that the home was not being lived in by anyone else, as would likely be true for a stash house. Occupants of a home may have no relationship to illegal activity taking place beneath its roof, and here, what Officer Fletcher knew is simply too limited to support the assumption that everyone in the Victoria Street house was connected to illegal activity. Moreover, Officer Fletcher's suggestion that the home was Mr. Huerta-Gonzalez's stash house is perhaps inconsistent with the government's argument in its memorandum that Mr. Barron-Celis and Mr. Cruz were Mr. Huerta-Gonzalez's suppliers.

10

defendant. *Id.* at 406. The officers saw the defendant in the company of a known drug dealer who was planning to sell marijuana and cocaine to an undercover agent, and the two were in "areas where the deal was being arranged." *Id.* Second, the drug dealer told the undercover agent the cocaine would be delivered within a half hour of providing the marijuana, while the defendant was a guest at a motel "within the one-half hour radius of the place where [the dealer] delivered the marijuana." *Id.* at 406. Despite the officers' knowledge of these facts, the court concluded that neither the defendant's proximity to the known drug dealer nor his "presence . . . in a location known to be frequently involved in narcotics sales or other crimes" was sufficient to establish probable cause. *Id.* Because the defendant's arrest was not supported by probable cause, the court concluded that the evidence obtained from his motel room should have been suppressed. *Id.*[9]

The government's showing of probable cause as to Mr. Barron-Celis is even weaker than the showing relied upon by the police in *Everroad*.[10] Officers here had no

---

[9] Additional authority supports the Court's conclusion that law enforcement lacked probable cause to believe that Mr. Barron-Celis was engaged in criminal activity or that the Jeep contained evidence of a crime based only on his mere propinquity to a suspect and location connected to drug trafficking. *See United States v. Valentine*, 539 F.3d 88, 93–95 (2nd Cir. 2008) (concluding that there was no probable cause where the defendant was present and associating with other men at an apartment building where a controlled buy was to take place, but the officers had no reason to believe there were any participants in the controlled buy other than the intended purchaser); *United States v. Ingrao*, 897 F.2d 860, 862-66 (7th Cir. 1990) (concluding that the police lacked probable cause to arrest the defendant where he had not previously been seen with known drug trafficker, was merely observed near a suspected drug transaction and residence associated with drug trafficking, was seen carrying a black bag while leaving a gangway shared by two houses including the drug trafficker's residence, and did not engage in any conduct bolstering probable cause after leaving the area); *United States v. Valencia-Meraz*, No. 06-cr-82 (PAM/RLE), 2006 WL 1704302, at *13-15 (D. Minn. May 10, 2006) (relying, in part, on *Everroad* to conclude that police lacked probable cause to arrest the defendant based on his mere presence in the vehicle with an individual identified by a confidential informant as the person involved in a methamphetamine transaction).

[10] Cases that have distinguished *Everroad* have focused on officers' additional observations of a defendant during the course of a drug transaction or their proximity
*(footnote continued on following page)*

11

information connecting the two men they saw leaving the Victoria Street residence to any illegal conduct, and they had nothing more than a generalized suspicion that the Jeep contained contraband or evidence of criminal activity. Neither Officer Fletcher nor any other law enforcement official had ever seen Mr. Barron-Celis or Mr. Cruz before they exited the Victoria Street residence on November 1st. There is no evidence linking either of the men to any of the previous controlled buys. Nor did the officers have any prior observations that tied the Jeep to prior drug-trafficking activity or to a suspect in their investigation. There is also no evidence that during their November 1st surveillance, officers observed anything that occurred inside or around the home that would have strengthened their suspicion regarding the two men they saw walk out more than ninety minutes after Mr. Huerta-Gonzalez's arrest. The government presented no evidence concerning the behavior of the two men that may have added to the probable cause calculus.[11]

---

(*footnote continued from previous page*)

to the target of the investigation under circumstances where it is reasonable to conclude the defendants were involved. *See, e.g.*, *United States v. Caves*, 890 F.2d 87 (8th Cir. 1989) (distinguishing *Everroad* from a case where "the association between [the target of the investigation] and [the defendant] was contemporaneous with the time of the criminal activity [and] the nature of the criminal activity [transporting drugs in a vehicle over long distances] was such that it could hardly have been carried out without [the defendant's] knowledge"); *United States v. Clark*, 754 F.2d 789 (8th Cir. 1985) (concluding that police had probable cause to arrest based on the defendant's presence and proximity to her husband before, during, and after his participation in a controlled buy and her observations of him throughout that encounter). Such distinguishing circumstances are not present here. The officers observed nothing at all that took place inside the home, let alone facts that would lead a reasonable person to conclude that Mr. Huerta-Gonzalez could not have carried out his business in the house without Mr. Barron-Celis' knowledge.

[11]  The Court need not decide whether the officers could have formed a reasonable articulable suspicion regarding the two men they saw walking out of the home, which may have justified a *Terry* stop. The government has not made any argument regarding *Terry*, and indeed, it would be difficult to characterize the encounter that occurred immediately upon stopping the Jeep at the hotel as anything other than a full-blown seizure.

12

Officer Fletcher's testimony that he suspected Mr. Huerta-Gonzalez may have placed a call to the men seen leaving the house does not alter the Court's conclusion. Officer Fletcher stated that from his prior experience he believed it was not uncommon for someone in Mr. Huerta-Gonzalez's position to call associates to warn them about law enforcement contact. However, his testimony adds no particularized facts to the probable cause analysis, and crediting it here would improperly elevate mere speculation to probable cause. Indeed, Officer Fletcher testified that officers "had no indication that a phone call had been made." Tr. 36:4-5. The government also produced no evidence that Mr. Huerta-Gonzalez or Ms. Ibarra-Sanchez had any opportunity to place a telephone call to anyone at the Victoria Street residence after their felony arrests for drug-trafficking. Moreover, the timing of Mr. Barron-Celis and Mr. Cruz's exit from the house diminishes the likelihood they were responding to a warning call. Had such a call been placed just before Mr. Huerta-Gonzalez was stopped, it is unlikely that criminal associates inside the home would wait as much as two hours to take incriminating evidence and leave the home.

The Court finds that at the time of Mr. Baron-Celis's arrest and the search of the Jeep, the particularized facts known to the officers failed to create a fair probability that he was engaged in criminal activity or that contraband or evidence of a crime would be found in the vehicle. Because such probable cause was lacking, the search of the Jeep was not valid under the automobile exception. In addition, the search could not be justified as incident to a valid arrest. Mr. Barron-Celis's motion should be granted to the extent it seeks suppression of the evidence seized during the search of the Jeep.[12]

---

[12] In his reply memorandum, Mr. Barron-Celis argues, for the first time, that if the evidence obtained in the search of the Jeep is suppressed, the indictment must be dismissed. Barron-Celis Reply at 9-10. However, the Court is unwaware of whether other evidence exists on which the government might rely to prove its case. Mr. Barron-Celis also contends for the first time in his reply, that the Court must prohibit the introduction of statements against him that were made by Mr. Cruz "as derivative of the illegal stop." *Id.* at 10. Mr. Barron-Celis addresses the suppression of Mr. Cruz's statements in a single sentence that provides insufficient detail for the Court to make any determination whether those statements were, in fact, the fruit of an unlawful seizure.

## II.    Ms. Ibarra-Sanchez's Motion: The Woodbridge Street Warrant

After carefully reviewing the materials submitted by the government related to Ms. Ibarra-Sanchez's motion, the Court concludes that the warrant to search the Woodbridge Street apartment was based on probable cause. The application and the affidavit supporting the application for authorization to search the Woodbridge residence were submitted at the same time as the warrant application was provided for the Victoria Street residence. Gov't's Ex. 1. The affidavit explains that in August 2016, the detective began conducting surveillance of Mr. Huerta-Gonzalez at the Woodbridge Street address. He explained that he conducted multiple controlled purchases of methamphetamine using a confidential informant and an undercover agent. During those transactions, he saw Mr. Huerta-Gonzalez leave the Woodbridge Street apartment and return to the apartment building. The affidavit further describes how officers observed Mr. Huerta-Gonzalez leave the Woodbridge Street apartment and stop near the Victoria Street residence. The affidavit continues by identifying precisely the same series of events that were articulated in the search warrant application for the Victoria Street address. *Compare* Gov't's Ex. 1 *with* Gov't's Ex. 2. Based on these facts the affiant asserted that he believed the Woodbridge residence was being used as an outlet for drug trafficking and that there was likely to be evidence of criminal activity in the home. A Ramsey County District Court Judge agreed and signed the warrant on November 1, 2016.

This affidavit provides a substantial basis on which the issuing court could have concluded there was probable cause to search the apartment located on Woodbridge Street. It provides a sufficient nexus between Mr. Huerta-Gonzalez's observed criminal activity (the controlled buys) and the property (leaving from and returning to the property in connection with those controlled buys). The Woodbridge Street apartment was presented as Mr. Huerta-Gonzalez's likely residence, which further supports the conclusion that evidence of criminal activity would be located there. *See United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007) ("Although we have not adopted a per se rule to the effect that probable cause to arrest a drug trafficker establishes an inference that records, paraphernalia, and other evidence of drug trafficking exists at the trafficker's residence, we have found probable cause to exist in cases in which officers have stated that in their experience such an inference is appropriate and in which a supporting affidavit also described a defendant's continuous course of drug trafficking activity.") The affiant further explains how

14

Mr. Huerta-Gonzalez left the Woodbridge residence on November 1st and picked up a significant quantity of drugs. The affiant further explains that in his training, experience, and knowledge, items such as electronic devices he expected to find in the premises would likely contain evidence of the drug-trafficking activity. These facts are sufficient to establish probable cause to search the home.

## RECOMMENDATION

Based on the foregoing, the Court makes the following recommendations.

1. Mr. Barron-Celis's motion to suppress (ECF No. 74) should be **DENIED IN PART** and **GRANTED IN PART** as set forth above.

2. Ms. Ibarra-Sanchez's motion to suppress (ECF No. 49) should be **DENIED**.

Date: April 4, 2017

*s/Katherine Menendez*
Katherine Menendez
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.